United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INFORMATICA CORPORATION

    Plaintiff,

    v.

BUSINESS OBJECTS DATA INTEGRATION, INC.

    Defendant.
_____/

No. C 02-03378 EDL

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TREBLE DAMAGES, ATTORNEYS' FEES AND PREJUDGMENT INTEREST, AND SETTING HEARING ON POST-TRIAL MOTIONS**

This patent infringement action came before the Court for trial by jury on March 12, 2007. Following the close of evidence, argument of counsel, and the Court's instructions, the case was submitted to the jury on March 29, 2007. On April 2, 2007, after one and one-half days of deliberation, the jury returned a unanimous verdict for Plaintiff Informatica Corporation, finding that Defendant Business Objects Data Integration, Inc. ("BODI"), indirectly infringed claims 1, 8, 12, 15, and 18 of the '670 Patent, and claims 5, 7, and 11 of the '775 Patent, and that the claims are not invalid for anticipation, statutory bar or obviousness. The jury further found that BODI's infringement was willful.

The jury awarded reasonable royalty damages in the amount of $25,240,000. On the special verdict form, the jury attributed $2,524,000, or 10% of the damages award, to BODI's act of supplying or causing to be supplied in or from the United States all or a substantial portion of the components of a patented invention, in such a manner as to actively induce the combination of such components outside of the United States in a manner that would infringe any of the claims at issue if such combination had occurred within the United States. See 35 U.S.C. § 271(f).

Informatica's motion for treble damages, attorneys' fees and prejudgment interest against BODI came on for hearing before this Court on May 8, 2007. Both parties were represented by their respective counsel. Having considered the evidence of record, the verdict of the jury, and the briefs and argument of counsel on Informatica's motion and on the impact of the Supreme Court's recent decision in Microsoft v. AT&T, ___ U.S. ___, 127 S.Ct. 1746 (U.S., Apr.30, 2007), the Court concludes that Informatica has demonstrated that a modest enhancement of damages is appropriate, and that the specific amount of enhanced damages will be determined upon post-trial motions. The Court further concludes that Informatica is not entitled to attorneys' fees, and that prejudgment interest is appropriate.

## I. MICROSOFT V. AT&T

Section 271(f)(1) provides as follows:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.[1]

35 U.S.C. § 271(f)(1). At trial, BODI agreed that under existing law, Section 271(f) imposed liability on method claims for foreign sales, with the understanding that the Supreme Court might decide the issue differently in its upcoming Microsoft decision. Trial. Tr. at 921:25-922:20, 925:1-5.

Informatica submitted evidence at trial in the form of a verified discovery response regarding how BODI supplies the software at issue to its foreign customers:

> At present, Business Objects cuts and validates a master CD for its products in San Jose. The master CD is sent for duplication to a third party contractor in Ireland, MPO. MPO ships these CDs to another third party contractor in Ireland, Moduslink, which packages the product and ships it directly to end users. Prior to MPO setting up operations in Ireland, Business Objects sent the master CDs to MPO in Paris for duplication and distribution occurred from there. Prior to its acquisition by Business Objects, ACTA cut and validated its master CDs in the San Jose area. All shipments of ACTA product originated from there.
>
> Business Objects also makes downloads of its products available over the internet using a service offered by Intraware. Business Objects

---

[1] Section 271(f)(2) is not at issue because Judge White determined that BODI's software was capable of substantial non-infringing uses. See Order re Cross-Motions for Summary Judgment (Docket no. 341) (denying summary judgment as to contributory infringement).

2

> uploads product and upgrades in San Jose that customers can download anywhere.

Trial Ex. 452 at 3 (Response to Second 30(b)(6) Deposition Notice Topic No. 6).

At trial, Informatica's expert on damages, Dr. O'Brien opined that a reasonable royalty should be based on a flat fee per license and that about $28.4 million out of total reasonable royalties of $42.9 million, or 66%, resulted from foreign sales. Trial Tr. at 1011:24-1012:12. BODI's expert, Mr. Meyer, calculated damages instead based on a royalty of 1% of domestic and foreign sales, with foreign sales of approximately $84 million out of $161 million, or about 52% of total sales. Trial Tr. at 1732:24-1733:10. The jury found that only $2,524,000, or 10% of the damages, were based on foreign sales. Verdict Form, Ques. No. 10 (docket no. 660).

After the verdict was entered, the Supreme Court handed down its decision in Microsoft. The Supreme Court held that software, uncoupled from a medium, did not constitute a component supplied from the U.S. for combination with the patented invention, a speech-processing computer, under Section 271(f). Microsoft, 127 S.Ct. at 1755. In Microsoft, AT&T sued for infringement of its patent on an apparatus for digitally encoding and compressing recorded speech. Microsoft conceded that its Windows operating system incorporates software code that, when installed, enables a computer to process speech in the manner claimed by the patent. 127 S.Ct. at 1750. The Federal Circuit affirmed the district court's summary judgment of infringement. The Supreme Court granted certiorari on the question of whether "Microsoft's liability extends to computers made in another country when loaded with Windows software copied abroad from a master disk or electronic transmission dispatched by Microsoft from the United States." Id. at 1750-51. The Supreme Court found that the master disk or electronic transmission that Microsoft sends from the United States is never installed on any of the foreign-made computers in question, but rather that copies made abroad are used for installation. Id. at 1751. The Supreme Court held that "[b]ecause Microsoft does not export from the United States the copies actually installed, it does not 'supply from the United States' 'components' of the relevant computers, and therefore is not liable under § 271(f) as currently written." Id.

The Supreme Court addressed two questions raised by Microsoft: (1) "when, or in what form, does software qualify as a 'component' under § 271(f)?" and (2) "were 'components' of the

3

foreign-made computers involved in this case 'supplied' by Microsoft 'from the United States'"? Id. at 1755. As to the first question, the Court identified two competing ways to conceptualize software: either as software code in the abstract, like a blueprint, before being expressed as a computer-readable copy; or as a tangible copy of software encoded on a medium, such as a CD-ROM. The Court held that only tangible software could be a combinable component under Section 271(f), where the patented invention was a speech-processing computer, reasoning that "an actual, physical copy of the software must be delivered by CD-ROM or some other means capable of interfacing with the computer." Id. at 1756. Responding to Justice Stevens' dissenting opinion that "unlike a blueprint that merely instructs a user how to do something, software actually causes infringing conduct to occur," id. at 1763 (Stevens, J., dissenting), the Court noted that "Windows can 'cause infringing conduct to occur' - i.e., function as part of AT&T's speech-processing computer - only when expressed as a computer-readable copy." Id. at 1756 n.12.

As to the second question regarding the element of supplying a component, the Court held that because "the copies of Windows actually installed on the foreign computers were not themselves supplied from the United States," and did not even exist "until they were generated by third parties outside the United States," id. at 1757, Microsoft did not supply components from the United States. The Court rejected the Federal Circuit's reasoning that a master disk sent abroad "'differs not at all from the exact copies, easily, inexpensively, and swiftly generated from the master.'" Id. at 1756, quoting AT&T Corp. v. Microsoft, 414 F.3d 1366, 1370 (Fed. Cir. 2005). Emphasizing that Section 271(f) prohibits the supply of components from the United States, the Court held that "Section 271(f) contains no instruction to gauge when duplication is easy and cheap enough to deem a copy in fact made abroad nevertheless 'supplied from the United States.' The absence of anything addressing copying in the statutory text weighs against a judicial determination that replication abroad of a master dispatched from the United States 'supplies' the foreign-made copies from the United States within the intendment of § 271(f)." Id. at 1756.

Like the master disks shipped abroad by BODI, the Windows program at issue in Microsoft was written in the United States and encoded onto "golden master" CDs, which were shipped abroad. 127 S.Ct. at 1761 (Alioto, J., concurring). Then, "the code was copied onto other disks that

4

are then placed into foreign-made computers for purposes of installing the Windows program." Id. Microsoft held that "the very components supplied from the United States, and not copies thereof, trigger § 271(f) liability when combined abroad to form the patented invention at issue." Id. at 1757. (Ginsburg, J.).  In his concurring opinion, Justice Alito, joined by Justices Thomas and Breyer, went further to state that "[b]ecause no physical object originating in the United States was combined with these [foreign-made] computers, there was no violation of § 271(f).  Accordingly, it is irrelevant that the Windows software was not copied onto the foreign-made computers directly from the master disk . . . that originated in the United States. . . . Because the physical incarnation of code on the Windows CD-ROM supplied from the United States is not a 'component' of an infringing device under § 271(f), it logically follows that a copy of such a CD-ROM also is not a component." Id. at 1762 (Alioto, J., concurring).

Significantly, the Court stressed the presumption of extraterritoriality as decisive in resolving close questions under patent law:

> Any doubt that M's conduct falls outside § 271(f)'s compass would be resolved by the presumption against extraterritoriality, on which we have already touched. [Citing 127 S.Ct. at 1750-1751, 1752.]  The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law. . . . Applied to this case, the presumption tugs strongly against construction of § 271(f) to encompass as a 'component' not only a physical copy of software, but also software's intangible code, and to render 'supplied . . . from the United States' not only exported copies of software, but also duplicates made abroad.

127 S.Ct. at 1758 (citations omitted).[2]  Thus, the Court applied the presumption to its analysis of the element of supplying from the United States as well as the meaning of "component."  Citing Judge Rader's dissent below with approval, the Court agreed with the Solicitor General that AT&T's interpretation of section 271(f) "'converts a single act of supply from the United States into a springboard for liability each time a copy of the software is subsequently made [abroad] and combined with computer hardware [abroad] for sale [abroad].'"  Id. at 1758-59.

---

[2] The Supreme Court also extensively analyzed the legislative history of Section 271(f) as a response to a loophole identified in Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518 (1972), and recognized that provision as an exception to the general rule that U.S. patent law does not apply extraterritorially.

5

Informatica contends that Microsoft does not disturb the Federal Circuit's holding in Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366 (Fed. Cir. 2005), contrasting the apparatus claim in Microsoft with the method claims here and in Union Carbide. Union Carbide involved Union Carbide's process patent for producing ethylene oxide. There, the district court ruled that Section 271(f) damages were not available for process claims. Relying on its decision in Eolas v. Microsoft, 399 F.3d 1325 (Fed. Cir. 2005), the Federal Circuit reversed, stating that Section 271(f) "makes no distinction between patentable method/process inventions and other forms of patentable inventions." 425 F.3d at 1379. Importantly, the Federal Circuit explained that, unlike the Microsoft case, "[t]his case . . . presents an even stronger basis for applying § 271(f) because Shell supplies all of its catalysts from the United States directly to foreign affiliates. Shell's foreign affiliates do not copy these catalysts and use the copies in a foreign process, but instead use the catalysts supplied by Shell directly in their processes." Id. Furthermore, in distinguishing NTP, Inc. v. Research in Motion, 418 F.3d 1282, 1322 (Fed. Cir. 2005), on the same basis, the Federal Circuit in Union Carbide expressed great skepticism that a patented method could come withing the purview of Section 271(f). Id. ("it is difficult to conceive of how one might supply or cause to be supplied all or a substantial portion of the steps of a patented method in the sense contemplated by the phrase 'components of a patented invention' in section 271(f)"). Although Union Carbide stands for the general principle that Section 271(f) can apply to method claims as well as apparatus claims when the components are supplied to foreign users in a particular manner, it is distinguishable from Microsoft, as well as the present case, where the infringer supplied software on a master disk to a foreign, third-party contractor who then duplicated the disk to distribute copies. Union Carbide, 425 F.3d at 1380 ("Because Shell supplies these catalysts directly to its foreign affiliates, this court does not face another situation involving the domestic sale of a component being used, in part, outside the United States.").

As Informatica points out, the Supreme Court declined in a footnote to squarely answer the question of whether software in the abstract could ever be a component of a patented method invention under Section 271(f). 127 S.Ct. at 1756 n.13. Yet interestingly, the broader question that the Supreme Court reserved in this footnote is whether an intangible method or process can ever

6

qualify as a patented invention, not just the issue of whether software, in the abstract, could ever be a component within the meaning of Section 271(f):

> We need not address whether software in the abstract, or any other intangible, can ever be a component under § 271(f). <u>If an intangible method or process, for instance, qualifies as a "patented invention" under § 271(f) (a question as to which we express no opinion)</u>, the combinable components of that invention might be intangible as well. The invention before us, however, AT& T's speech-processing computer, is a tangible thing.

<u>Id.</u> (emphasis added). Informatica refers to Shell Oil Company's <u>amicus</u> brief in <u>Microsoft</u>, contending that the Supreme Court rejected its invitation to address the Federal Circuit's holding in <u>Union Carbide</u> and <u>Eolas</u>.[3] Informatica Br. re Impact (docket no. 688) at 5, n.4. In fact, Shell Oil asked the Supreme Court to review the Federal Circuit's decision in <u>Eolas</u> as overreaching in its holding that Section 271(f) applies to patented processes, rather than being limited to "a component of a patented machine, manufacture, combination, or composition." Brief of Shell Oil Co. as <u>Amicus Curiae</u> in Support of Petitioner at 10-11, <u>Microsoft Corp. v. AT&T Corp.</u>, 2006 WL 3740358 (U.S., Dec. 15, 2006) (No. 05-1056).

In <u>Eolas</u>, the Federal Circuit held that Section 271(f) "does not impose a requirement of 'tangibility' on any component of a patented invention.'" 399 F.3d at 1340. The Federal Circuit rejected Microsoft's argument there that Section 271(f) was limited to the components of a physical machine, as presented in <u>Deepsouth Packing</u>, and held that "components" in Section 271(f)(1) included software code on golden master disks. 399 F.3d at 1341. In its <u>amicus</u> brief, Shell Oil suggested that the Federal Circuit misconstrued "component" in Section 271(f) to apply to intangible process patents, when the language of Section 271(c) distinguishes **a component** of a patented machine, manufacture, combination, or composition from **a material or apparatus** for use in practicing a patented process. <u>Id.</u> at 10. This is the larger question which the Supreme Court declined to address.

---

[3] Shell Oil noted that it settled the action with Union Carbide, explaining why it did not petition for <u>certiorari</u> from the <u>Union Carbide</u> decision. <u>Id.</u> at 3; <u>see</u> Informatica Br. re Impact at 3, n.2 ("Neither party petitioned for <u>certiorari</u>.")

7

Consistent with Union Carbide on the issue of directly supplying components abroad, Microsoft controls on the issue of whether BODI "supplied" components from the United States by exporting master disks, but not user-ready copies, of its software. To the degree that there is any ambiguity, that ambiguity must be resolved by limiting the scope of Section 271(f) in light of the presumption of extraterritoriality as the Supreme Court cautioned. 127 S.Ct. at 1758. Furthermore, Microsoft calls into question the reasoning of Eolas to the extent that the Federal Circuit may have been referring to software in the abstract, rather than captured in a medium.[4]

The evidence at trial established that BODI used four different methods to supply customers abroad: (1) shipping a master CD from San Jose, California to Ireland, and previously Paris, for duplication after Acta's acquisition by Business Objects; (2) shipping Acta's product directly from San Jose before acquisition by Business Objects; (3) downloading through a third party, Intraware; and (4) downloading directly from BODI in San Jose. Trial Ex. 452. There is no evidence breaking down the amount of sales made by each method, although the direct shipments abroad prior to Acta's acquisition for at most a few months were likely minimal. The element of supplying components from the United States to establish Section 271(f) liability is not met here as to copies supplied by the first method of a master disk duplicated abroad. Under Microsoft, "the very components supplied from the United States, and not copies thereof, trigger § 271(f) liability when combined abroad to form the patented invention at issue," 127 S.Ct. at 1757, and "the patent is infringed only when a computer is loaded with [Data Integrator] and is thereby rendered capable of performing as the patented [process.]" Id. at 1750. Indeed, because the claim here is inducement of infringing use by customers, the foreign customer must actually load the software copy onto a server or other hardware and then create a dataflow using the EDF feature with one input and one output to directly infringe the patented process. Thus, the software supplied to foreign customers by means of a master disk duplicated abroad does not trigger liability under Section 271(f).

---

[4] In its only reference to Eolas, the Supreme Court noted that the Federal Circuit did not articulate whether the software at issue was software in the abstract, or a tangible copy of software. 1754 n. 10. At oral argument, Justice Ginsburg, who delivered the Microsoft opinion, noted the ambiguity on that issue in the Federal Circuit's opinion below in AT&T Corp. v. Microsoft, 414 F.3d 1366 (Fed. Cir. 2005). See Transcript of Oral Argument at 13-15, Microsoft v. AT&T Corp., 2007 WL 541886 (U.S., Feb. 21, 2007) (No. 05-1056).

8

As to the second method, where Acta duplicated and shipped software from San Jose, such foreign sales, if any were made during the brief window of relevant time, fall within the scope of Section 271(f), as defense counsel acknowledged at oral argument. The impact of Microsoft is somewhat less clear as to the third and fourth methods, which involve downloading software from the internet. This issue will be more fully addressed in the context of BODI's forthcoming motion for a new trial on damages.

As Microsoft impacts the calculation of the amount of damages under Section 271(f), the Court suggested and the parties agreed to defer the determination of the amount of enhancement of damages until the Court rules on BODI's forthcoming motion for new trial on damages. The Court also adopts Informatica's proposal as to how to amend its proposed order on its motion for injunction in light of the Court's reading of Microsoft.

## II. ENHANCED DAMAGES

The Court may increase damages awarded in this infringement action "up to three times the amount found or assessed." 35 U.S.C. § 284. "An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court." Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992), abrogated on other grounds by Markman v. Westview Instruments, Inc., 52 F.3d 967, 975 (Fed.Cir.1995) (en banc). If the Court decides to enhance damages, the Court looks to the totality of circumstances and considers the egregiousness of the defendant's conduct as well as factors that are mitigating or ameliorating to set the amount of enhancement. Read, 970 F.2d at 826; Rite-Hite Corp. v. Kelley Co., 819 F.2d 1120, 1125-26 (Fed. Cir. 1987).

Although willful infringement may authorize the award of enhanced damages, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." Read, 970 F.2d at 826. Upon a jury finding of willfulness, however, the Court must provide reasons for not increasing a damages award. Jurgens v. CBK, Ltd., 80 F.3d 1566, 1572 (Fed. Cir. 1996). The Federal Circuit has articulated the following factors to consider on enhancement:

9

(1) whether the infringer deliberately copied the ideas or design of another;

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

(3) the infringer's behavior as a party to the litigation;

(4) Defendant's size and financial condition;

(5) Closeness of the case;

(6) Duration of defendant's misconduct;

(7) Remedial action by the defendant;

(8) Defendant's motivation for harm;

(9) Whether defendant attempted to conceal its misconduct.

Read, 970 F.2d at 827 (reversing award of enhanced damages). "Inasmuch as a finding of willful infringement does not mandate enhancement of damages, the above factors taken together assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages and how much the damages should be increased." Id. at 828.

In light of the jury's finding of willfulness and examination of the Read factors, the Court concludes that a modest enhancement of damages is appropriate, though not a substantial enhancement. In view of the detailed jury instruction on willfulness, which include the factors of whether BODI "investigated the scope of the patent and formed a good-faith belief that the patent was invalid or that it was not infringed," and reliance on legal opinion (docket no. 654, Instruction No. 39), it is apparent that the jury rejected BODI's contention that it relied in good faith on the opinion of counsel and had a good-faith belief of invalidity or non-infringement. See Jurgens, 80 F.3d at 1572. Furthermore, BODI did not take any intermediate remedial action to remove the EDF feature, even after Informatica's infringement theory was narrowed from the whole product to the EDF feature. Finally, as to the duration of misconduct, BODI has sold the infringing product since 2001, while on notice of potential infringement, although it is true that Informatica did not articulate its surviving, narrower infringement theory until 2006.

On the other hand, there is no contention that BODI deliberately copied Informatica's ideas or attempted to conceal its infringement. See BODI Opp. at 18, n.10. Nor does Informatica point to any negative behavior by BODI during the litigation. On the issue of closeness of the case, willfulness was a close question given the uncertainty of how the claims would be construed in the software patents at issue and the evolution of Informatica's infringement theory, including the withdrawal of the '990 Patent shortly before trial. The invalidity defense was also a somewhat close question. Although the jury resolved these issues in favor of Informatica, this result is not determinative of whether the questions were closely balanced and hotly contested. See Applied Medical Resources Corp. v. United States Surgical Corp., 967 F.Supp. 861, 865 (E.D. Va. 1997). The closeness of these issues weigh against substantial enhancement of damages.

Other Read factors are either neutral or do not weigh heavily. As to the infringer's size and financial condition, BODI's financial status as an international conglomerate is offset by its relatively small market share in the ETL market compared to Informatica's. As to BODI's motivation for harm, its aggressive attempts to compete are not, by themselves, evidence of bad faith, and did not succeed in eliminating Informatica's market dominance.

In the totality of facts and circumstances, the Court may consider the size of the damages award upon ruling on enhancement. Riles v. Shell Exploration and Production Co., 298 F.3d 1302, 1314 (Fed.Cir. 2002) (affirming denial of enhanced damages). Here, the jury awarded a substantial amount of damages, $25,240,000, or about 60% of the total royalties sought by Informatica, and far more than the amount calculated by BODI's expert. The damages will be adjusted downward, however, to exclude foreign sales that fall outside the reach of Section 271(f), as determined by the Supreme Court in Microsoft. This adjustment may significantly reduce the award, thereby affecting the issue of the amount of enhancement.

Although the jury determined that only 10% of the total sales reflected the supply of components outside the United States, the evidence suggested that the percentage was significantly higher, and BODI has stated its intention to file a motion for new trial on damages. The Court will therefore defer determination of the amount of enhancement until ruling on the motion for new trial.

11

## III. ATTORNEYS' FEES

Informatica further requests an award of attorneys' fees. Under Section 285, the Court may award attorneys' fees in "exceptional cases." First, the Court must determine that a case is "exceptional." Then it may exercise its discretion to award fees to the prevailing party. See S.C. Johnson & Sons v. Carter-Wallace, Inc., 781 F.2d 198, 201 (Fed.Cir.1986). "The purpose of § 285 when applied to accused infringers is generally said to be two-fold: one, it discourages infringement by penalizing the infringer; and two, it prevents "gross injustice" when the accused infringer has litigated in bad faith." Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1552 (Fed. Cir. 1989) "Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit." Id.

The Court may consider the following criteria on a motion for fees:

> Willful infringement, the award of enhanced damages, and the award of attorney fees in exceptional cases are all related but independent concepts. As with enhanced damages a finding of willful infringement is sufficient to declare a case exceptional but it does not mandate that conclusion. However, if a court is to declare a case not exceptional in such circumstances it must articulate its reasons for doing so. Finally, "even an exceptional case does not require in all circumstances the award of attorney fees." [S.C. Johnson, 781 F.2d at 201.] The decision to award fees is ultimately committed to the sound discretion of the trial court. [Modine Mfg. Co. v. Allen Group, Inc., 917 F.2d 538, 543 (Fed. Cir. 1990), cert. denied, 500 U.S. 918 (1991)].
>
> The criteria a court ought to consider in making these decisions is parallel to but not the same as that set forth in Read. The Court has considered such criteria and believes it serves to inform the Court as to the factual finding it must make as to whether the case is exceptional within § 285. See Reactive Metals and Alloys v. ESM, Inc., 769 F.2d 1578, 1578 (Fed.Cir.1985).

Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc., 2000 WL 34334583 at *17 (N.D. Cal. 2000). Here, consulting the Read factors for enhancement, as articulated in Section II, supra, the Court declines to find that this case qualifies as an "exceptional case." In particular, the closeness of the evidence of willfulness and BODI's assertion of substantial invalidity defenses negate the conclusion that this case is exceptional.

Even if it were deemed exceptional, a finding of willful infringement does not mandate that attorneys' fees be awarded. See Mot. for Treble Damages, Fees & Prejud. Int. at 16. Considering the totality of information, such as the closeness of the issues litigated, the refinement of Informatica's infringement theory over the course of litigation, resulting in the accused feature being only one of many in the software at issue, and the high level of professionalism and advocacy on both sides, an award of attorneys fees is not appropriate here. The Court notes that out of the four original patents in suit, BODI succeeded on two of them, with a favorable summary judgment ruling on the '374 patent, and Informatica's withdrawal of the '990 patent. Further, an award of attorneys' fees would not further the dual purposes of Section 285. First, the damages award as enhanced will adequately penalize BODI for willful infringement. Second, Informatica has not demonstrated "gross injustice" from bad faith litigation; BODI did not exhibit frivolous or vexatious conduct during the litigation. Accordingly, Informatica's motion for attorneys' fees is denied.

## IV.  PREJUDGMENT INTEREST

Prejudgment interest is ordinarily awarded to the prevailing plaintiff in a patent infringement suit, although Informatica acknowledges that the rate of interest and whether to compound it are within the Court's discretion. Mot. at 17. BODI does not oppose the award of prejudgment interest, but contends that it should run from the date of McGoveran's June 2006 deposition, when Informatica's surviving theory of infringement was articulated. Prior to that, BODI argues, Informatica had not given meaningful notice of its claims. The circumstances of this case do not, however, merit departure from the normal procedure of awarding prejudgment interest from the date of infringement to the date of payment. See Bio-Rad Labs., Inc. v. Nicolet Instrum. Corp., 807 F.2d 964, 967 (Fed. Cir. 1986) ("An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of the infringement and the date of the judgment.").

The Court awards the prejudgment interest requested by Informatica of 4.78 % annually from the date of first infringement to the date of judgment. As with the amount of enhanced damages, the amount of prejudgment interest will be calculated after the Court rules on the parties' post-trial

motions, particularly the motion for new trial on damages. Prejudgment interest will be based only on the compensatory portion of the damages award, subject to the Court's ruling on post-trial motions, and not on the enhanced additional damages. <u>Beatrice Foods v. New England Printing</u>, 923 F.2d 1576, 1580-81 (Fed. Cir. 1991).

## V. CONCLUSION

For the reasons stated above, the Court grants Informatica's motion for enhanced damages and for prejudgment interest in an amount to be determined after ruling on post-trial motions. The Court denies Informatica's motion for attorneys' fees.

The parties shall file briefs on post-trial motions in accordance with the time limits set forth by the Federal Rules of Civil Procedure. A hearing on the motions is set for July 10, 2007 at 9 a.m.

IT IS SO ORDERED.

Dated: May 16, 2007       _____
                          ELIZABETH D. LAPORTE
                          United States Magistrate Judge